DAVID E. FILIPPI, OSB No. 965095
david.filippi@stoel.com
SAMANTHA K. SONDAG, OSB No. 154244
samantha.sondag@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503-224-3380
Facsimile: 503-220-2480

*Attorneys for Intervenor-Plaintiff Santiam Water Control District*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

MARION COUNTY, a Political Subdivision of the State of Oregon,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Intervenor-Plaintiffs,

v.

U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants,

and

Case No.: 6:26-cv-00956-MTK (Lead Case)
6:26-cv-01381-MTK (Trailing Case)

**COMPLAINT IN INTERVENTION**

Violations Of The Administrative Procedure Act, 5 U.S.C. §§ 701-706

NORTHWEST ENVIRONMENTAL
DEFENSE CENTER and NATIVE FISH
SOCIETY,

Intervenor-Defendants.

CITY OF SALEM, an Oregon Municipal
Corporation,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT,
and CITY OF STAYTON, an Oregon
municipal corporation,

Intervenor-Plaintiffs,

v.

UNITED STATES OF AMERICA, and
UNITED STATES ARMY CORPS OF
ENIGNEERS, an agency of the United States
government,

Defendants,

and

NORTHWEST ENVIRONMENTAL
DEFENSE CENTER and NATIVE FISH
SOCIETY,

Intervenor-Defendants.

## I. PARTIES

1. The Santiam Water Control District ("District" or "Intervenor") is a municipal corporation duly created and organized under ORS chapter 553, with its principal offices at 284 East Water Street, Stayton, Oregon 97383. The District operates an irrigation distribution system

extending from Stayton to Salem and relies on water stored in Detroit Reservoir to meet its water supply obligations.

2. Defendant United States Army Corps of Engineers ("Corps") is an agency of the United States Department of the Army responsible for the ownership, operation, and maintenance of the Willamette Valley System ("WVS"), a network of dams and reservoirs in Oregon's Willamette River Basin. Among other things, the Corps prepared and issued the Supplemental Environmental Impact Statement ("SEIS") challenged in this action and is responsible for implementing the operational changes addressed in those documents, including the deep drawdown at Detroit Reservoir.

3. Defendant United States of America is responsible for the actions of its agencies, officers, and employees, including the Corps.

4. Defendant Daniel P. Driscoll is sued only in his official capacity as Secretary of the Army responsible for overseeing the Corps and implementing various statutory duties including duties established by Sections 1002 and 1205(b) of Thomas R. Carper Water Resources Development Act of 2024 (S. 4367).

5. Defendant William H. Graham, Jr., is sued only in his official capacity as Chief of Engineers and Commanding General of the Corps responsible for overseeing the Corps and implementing various statutory duties including duties established by Sections 1002 and 1205(b) of Thomas R. Carper Water Resources Development Act of 2024 (S. 4367).

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over Intervenor's claims under 28 U.S.C. § 1346(b)(1).

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331, because this case arises under the laws of the United States, the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h, the Administrative Procedures Act, 5 U.S.C. §§ 701–706, the Clean Water Act, 33 U.S.C. § 1251 et seq., and the Water Resources Development Act of 2024.

8. Venue is proper under 28 U.S.C. 1391(b)(2), (e)(1), and LR 3-2(a)(3). Intervenor is located within this district.

## III. FACTUAL BACKGROUND

### A. The Corps' Supplemental Environmental Impact Statement.

9. The Corps owns, operates, and maintains the WVS, a system of thirteen federally operated dams and reservoirs located throughout the Willamette River Basin in Oregon. The WVS includes Detroit Dam and Detroit Reservoir on the North Santiam River. Water stored in Detroit Dam is released to supplement natural flows downstream through the North Santiam River.

10. In 2021, the Corps was ordered by the United States District Court for the District of Oregon to implement operational changes to the WVS, including Detroit Dam.

11. In 2024, the National Marine Fisheries Service issued a Biological Opinion and Essential Fish Habitat Response for the Continued Operation and Maintenance of the WVS ("BiOp"). The BiOp concluded that existing operations of the WVS jeopardized Upper Willamette River chinook salmon and steelhead, and established operational requirements intended to improve fish passage and survival within the WVS.

12. In May 2026, the Corps issued the SEIS analyzing proposed modifications, including the annual deep drawdowns of Detroit Reservoir. The Corps issued a Record of Decision ("ROD") documenting and publishing the SEIS on June 23, 2026. The SEIS

supplemented an Environmental Impact Statement ("EIS") issued by the Corps in April 2025.

13. The SEIS authorizes deep drawdowns of Detroit Reservoir to 1,395 feet as part of Interim Operations. The Corps will initiate the first deep drawdown of Detroit Reservoir in late 2026.

14. The District submitted comments on the Draft EIS and the Draft SEIS on February 23, 2023, and January 13, 2026, respectively, as well as during scoping in 2019.

**B. The Deep Drawdown's Impact on Water Supply.**

15. The WVS is authorized for purposes of irrigation, water supply, flood risk management, hydropower, recreation, navigation, municipal and industrial water supply, and fish and wildlife management.

16. The Flood Control Act of June 28, 1938, authorized the initial construction of several dams, including Detroit Dam, for flood control and navigation. The same year, Detroit Dam was authorized for irrigation in H.R. Doc. No. 75-544 ("HD 544"). Detroit Dam and Reservoir were subsequently authorized for additional uses.

17. The District has long provided critical flood control and irrigation water for farms in the Willamette Valley. Formed in 1954, the District now operates an irrigation distribution system consisting of 114 miles of canals and ditches extending between Stayton and Salem. The District presently delivers irrigation water for over 17,000 acres of land. The agricultural lands served by the District grow vegetables, hay, grain, grass, alfalfa, row crops, nursery crops, cattle, sheep, and other livestock, among other things.

18. The District also conveys water to three hydroelectric plants, to the City of Stayton and the City of Salem, and to the critical habitat of listed species. It also has contractual

delivery obligations for federal, state, and county facilities, wetland restoration projects, and wildlife.

19. To fulfill these obligations, the District holds over 197 cubic feet per second ("cfs") of consumptive and 947 cfs of non-consumptive surface water rights with priority dates spanning from 1866 to 1987.

20. Detroit Reservoir and the North Santiam River are critical to the District's operations. The District relies on water stored in Detroit Reservoir, which is located upstream of the District's points of diversion, to meet water demands.

21. One source of the District's stored water supplies are irrigation water contracts with the Bureau of Reclamation ("Reclamation"), which require Reclamation to supply the District with stored WVS water for irrigation use during the irrigation season. Reclamation contracts purport to disclaim liability for supply obligations in the event of drought or uncontrollable forces.

22. The deep drawdown poses a serious risk to the District's ability to meet its obligations. The SEIS acknowledges that in very dry winters, the deep drawdowns mean that the Corps may be unable to refill Detroit reservoir to minimum conservation pool, which could result in even lower reservoir levels than currently experienced in very dry years. This is particularly troubling given that the Corps anticipates that Interim Operations will result in insufficient stored water to meet full allocations for municipal and industrial storage agreements and irrigation water service contracts in dry years.

23. The SEIS includes virtually no analysis of this risk or how to mitigate it. It does not consider effects on specific stored water users. It relies on outdated datasets, undermining calculations and possibly misrepresenting available storage.

24. Nor does the SEIS offer reasonable solutions for addressing an allocation crisis. Instead, the Corps plans to rely on "an adaptive management framework," which it describes as "learning-while-doing in the face of uncertain outcomes." Using this framework, the Corps hopes to "coordinate with regional partners to minimize effects to downstream users reliant on streamflows." The District is not listed in the SEIS as a "regional partner."

25. It is unreasonable for the SEIS not to include and analyze a clear plan to address allocation in the impending event of inadequate water supply. The adaptive management framework offers no way for the District to ensure, or effectively advocate for, its own water supply demands.

26. The District raised its concerns about the lack of analysis regarding water supply and its impacts in commenting on both the Draft EIS and Draft SEIS. The District requested more thorough and accurate modeling using updated data sets. It also sought reservoir-specific analyses, including how proposed drawdowns would impact the likelihood of reservoir refill relative to subsequent water right allocations, and the drawdowns' implications for water users and ecosystem needs.

27. The District sought more information to assess whether there would be adequate flow to meet all needs—including agricultural, municipal, environmental, and instream purposes—with emphases on Detroit Reservoir and North Santiam. To that end, it specifically requested quantification of flow at the tributary level and a detailed tabulation of storage amounts and releases for Detroit Reservoir and North Santiam River.

28. The District also requested an analysis of water rights prioritization, including an assessment of whether current contract holders' rights would be grandfathered into future water management decisions as senior, that reductions during shortages be proportionately allocated

among new users, and that preference be given to existing users and ESA needs before new uses, in accordance with Oregon water law.

29. The District also sought analysis of a water management framework that would equitably align with the objectives of users and state water law, outline proportionate reduction strategies, and identify and resolve tension between the SEIS operational concepts and Reclamation stored water contracts, including an analysis of how releases will be accounted for in the total water availability budget.

30. The SEIS does not contain any such analysis necessary for an evaluation of the specific impacts that Interim Operations, including the deep drawdowns, will have on water supply, the District, and its users.

**C. The Deep Drawdown's Impact on Water Quality.**

31. The proposed deep drawdowns will significantly disturb sediments in Detroit Reservoir and downstream channels, including the North Santiam River, impacting water quality.

32. Under normal operating conditions, turbidity in the North Santiam River is typically bellow 10 Nephelometric Turbidity Units ("NTU"). The City of Salem has estimated that the deep drawdown will increase the concentration of suspended solids and fine particles in the North Santiam well above 50 NTUs, in violation of OAR 340-041-0036.

33. This risk is well known to the Corps. Turbidity concerns were the subject of many public comments, and with good reason: several years ago, deep drawdowns elsewhere in the WVS were disastrous for the Lebanon and Sweet Home communities, causing raw water turbidity levels as high as 350 NTU in waters that otherwise averaged 15 NTU during wintertime, and the deaths of tens of thousands of Kokanee salmon.

34. Increased turbidity levels may interfere with District's fish screens and fish barrier structure in its water conveyance systems, requiring the District to excavate sediment buildup from the fish screens and fish barrier structure, increasing operation costs to the District.

35. The disruption of sediment in the Willamette Basin, along with increased bank erosion and exposure, increases the risk of elevated concentrations of pollutants, including mercury and methylmercury (together, "mercury").

36. DEQ considers the District to be a Designated Management Agency ("DMA") under OAR 340-042-0030. DMAs are responsible for developing strategies and plans to manage Total Maximum Daily Loads (TMDLs) for pollutants in state waters in accordance with the Clean Water Act. There is a TMDL for mercury in place in the Willamette Basin.

37. Consistent with DEQ's Willamette Basin Mercury TMDL plan, the District has implemented strategies to manage mercury levels by reducing the amount of sediment discharged from District facilities into downstream waterbodies and maintaining and managing its own facilities.

38. There is a risk that the deep drawdowns will cause mercury levels to increase beyond that allowed by the TMDL. Should mercury levels increase, DEQ could take the position that the District must modify or even close its water conveyance systems to prevent the flow of sediment, and pollutants, to downstream channels.

39. In commenting on the Draft SEIS, the District requested that Defendants address water quality risks and outline robust contingency planning.

40. Despite knowing that deep drawdowns will significantly disturb sediment, the SEIS fails to adequately analyze these water quality risks.

41. Indeed, the Corps has failed to prepare a report analyzing turbidity impacts

associated with drawdowns despite a mandate in the Thomas R. Carper Water Resources Development Act of 2024 ("WRDA") that it do so. Among other things, that WRDA Report is supposed to address instances of high turbidity in WVS reservoirs resulting from drawdowns, report on turbidity monitoring, summarize records to compare turbidity before, during, and after drawdowns, identify lessons learned, and indicate how changes based on those lessons are being implemented.

42. Under WRDA, the turbidity report was due January 4, 2026. The Corps still has not submitted the WRDA turbidity report, depriving lawmakers, the public, and stakeholders—including the District—of critical information about the deep drawdowns.

43. Despite its failure to submit the turbidity report, the Corps still finalized the SEIS and ROD.

## IV. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the APA for Failure to Act in Accordance with 42 U.S.C. §§ 4321–4370h (5 U.S.C. § 706(2)(A))**

44. Intervenor incorporates the preceding paragraphs as though fully set forth herein.

45. The APA requires that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

46. Under 42 USC 4332(2)(C), all federal agency recommendations or reports on actions "significantly affecting the quality of the human environment" must include a "detailed statement" on reasonably foreseeable environmental effects of the proposed action. NEPA thus requires federal agencies to take a "hard look" at the environmental consequences of their proposed actions before those actions are implemented. 42 U.S.C. §§ 4321–4370h; *WildEarth*

*Guardians v. United States Dep't of Agric. Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F.4th 717, 728 (9th Cir. 2025).

47. A "'hard look' requires a consideration of 'all foreseeable direct and indirect impacts' and a full assessment of the cumulative impacts of the proposed action." *Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp. 3d 1146, 1156 (D. Or. 2019) (citing *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012)).

48. The SEIS prepared by the Corps fails to meet the "hard look" standard because it fails to adequately analyze the varied impacts of the Interim Operations, including the proposed annual deep drawdown of Detroit Reservoir.

49. The SEIS acknowledges that Interim Operations will result in insufficient stored water to meet municipal and industrial storage agreements and irrigation water service contracts in dry years, and that in very dry winters, Detroit Reservoir may not adequately refill, resulting in even lower reservoir levels than currently experienced in very dry years.

50. Despite recognizing the likelihood of water shortage, the SEIS fails to assess the degree or severity of that impact. Among other things, the SEIS:

a. Fails to utilize updated water flow in its models, undermining calculations and possibly misrepresenting available storage;

b. Fails to utilize updated climate data in analyzing future effects;

c. Fails to analyze tributary-specific data in evaluating the impact of the deep drawdown on stored water supply;

d. Fails to evaluate water flow at the tributary level to assess whether there will be adequate flow to meet all needs, including agricultural, municipal, environmental, and instream purposes;

e. Fails to conduct adequate reservoir-specific analyses, including how proposed drawdowns may affect reservoir refill and impact water users and ecosystem needs;

f. Fails to include and assess a detailed tabulation of storage amounts and releases for Detroit Reservoir and North Santiam River;

g. Fails to analyze how water rights holders' rights will be impacted by Interim Operations and the drawdowns, or how they will be prioritized; and

h. Fails to analyze and explain how releases will be accounted for in the total water availability budget.

51. The SEIS also admits that deep drawdowns will disturb and mobilize sediment and increase turbidity levels.

52. Despite recognizing the likely deterioration of water quality, the SEIS fails to assess the degree or severity of that impact. Among other things, the SEIS:

a. Fails to conduct a quantitative analysis of the deep drawdown's impacts on turbidity and pollutant concentrations on downstream water systems;

b. Fails to analyze whether the deep drawdown will violate Oregon water quality standards;

c. Fails to analyze the risks that decreased water quality caused by the deep drawdown may limit or suspend conveyance of water; and

d. Fails to incorporate a Congressionally mandated turbidity study for the WVS that should have informed the Corps' and the public's analysis.

53. Because the Corps had previously conducted drawdowns that caused water quality to deteriorate, it knew that similar operations at Detroit Reservoir could produce similar

downstream effects. Despite this knowledge, the SEIS does not adequately analyze the water quality impacts demonstrated by those prior drawdowns or evaluate the resulting risks to downstream municipal water systems.

54. The Corps' failure to take a hard look at water quality impacts directly impacts the District's conveyance of water as an entity recognized by Oregon DEQ as a DMA.

55. The Corps' failure to take a hard look at impacts on stored water supply directly impacts the District's ability to deliver water.

56. Defendants' failure to take a "hard look" at the environmental consequences of its proposed action and its reliance on the SEIS despite these deficiencies is arbitrary, capricious, and contrary to law within the meaning of the APA and thus is unlawful and must be set aside.

57. Under 5 U.S.C. § 705, the Court should therefore postpone the implementation of the Detroit Reservoir drawdown unless and until the Corps prepares a further SEIS that takes the required hard look at impacts on water quality and water supply in compliance with NEPA and the APA.

## SECOND CLAIM FOR RELIEF
**Violation of the APA for Failure to Act in Accordance with 42 U.S.C. 4332(C)(iii)**
**(5 U.S.C. § 706(2)(A))**

58. Intervenor incorporates by reference the preceding paragraphs as though fully set forth herein.

59. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

60. NEPA requires federal agencies to include in every recommendation for major federal action a detailed statement on a reasonable range of alternatives to the proposed agency

action. 42 U.S.C. 4332(C)(iii).

61. Consideration of reasonable alternatives is the "heart" of the NEPA process.

62. Defendants failed to consider reasonable alternatives, including:

a. Lifting or modifying a moratorium on new agricultural irrigation contracts in the Santiam Basin;

b. Developing mitigation strategies for dry years;

c. Establishing a prioritization schedule consistent with Oregon water law for times when stored water is insufficient to meet demand;

d. Adopting a water management framework with a proportionate reduction strategy to ensure fairness and compliance;

e. Adopting a water management framework that requires consideration of reservoir refill;

f. Adopting robust contingency plans to address water quality deterioration resulting from deep drawdowns.

63. These alternatives were feasible approaches to reducing and managing the environmental risks associated with Interim Operations, including the proposed deep drawdown.

64. The SEIS does not include a detailed statement analyzing the alternatives suggested by the District, including those outlined above.

65. By failing to rigorously evaluate these reasonable alternatives, the SEIS violates NEPA.

66. Defendants' decision to proceed without analyzing these alternatives is arbitrary, capricious, and not in accordance with law within the meaning of the APA and thus is unlawful and must be set aside. 5 U.S.C. § 706(2)(A).

67. The Corps' failure to evaluate these reasonable alternatives harms the District because the alternatives would substantially reduce the risk to the District's ability to supply water.

68. Under 5 U.S.C. § 705, the Court should therefore postpone the implementation of the Detroit deep drawdown unless and until the Corps adequately evaluates these reasonable alternatives in compliance with NEPA and the APA.

## THIRD CLAIM FOR RELIEF
### Violation of the APA for Failure to Act in Accordance with 5 U.S.C. § 553(c) (5 U.S.C. § 706(2)(A))

69. Intervenor incorporates by reference the preceding paragraphs as though fully set forth herein.

70. The APA requires federal agencies to consider the issues raised in the public comments and to respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate decision.

71. During the Draft EIS and Draft SEIS comment periods, the District submitted written comments explaining that Interim Operations, including the proposed deep drawdowns, could significantly impair the District's ability to supply water.

72. The District recommended additional analysis and alternatives to mitigate that risk.

73. Despite receiving these detailed comments, the SEIS does not meaningfully consider the impacts of diminished water quality and water supply likely to result from the proposed deep drawdowns, nor does it provide plans to mitigate those risks.

74. By failing to meaningfully consider the comments from the District and others,

Defendants violated APA's public participation and informed decision-making requirements.

75. Defendants' decision to proceed on the SEIS despite these deficiencies is arbitrary, capricious, and not in accordance with law and thus is unlawful and must be set aside. 5 U.S.C. § 706(2)(A).

76. Under 5 U.S.C. § 705, the Court should therefore postpone the implementation of the Detroit deep drawdown unless and until the Corps adequately considers and responds to public comments in compliance with NEPA and the APA.

**FOURTH CLAIM FOR RELIEF**
**Violation of the APA for Failure to Act in Accordance with the WRDA**
**(5 U.S.C. § 706(2)(A))**

77. Intervenor incorporates by reference the preceding paragraphs as though fully set forth herein.

78. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

79. The WRDA imposed specific obligations on the Corps related to turbidity impacts associated with reservoir drawdowns in the WVS.

80. The Corps was required under WRDA to analyze turbidity impacts associated with WVS reservoir drawdowns, identify lessons learned from past drawdowns, and implement those lessons by changing reservoir operations accordingly before proceeding with drawdown operations such as the proposed deep drawdown of Detroit Reservoir.

81. Despite this statutory mandate, the Corps failed to prepare the turbidity report required by WRDA before finalizing the SEIS and moving forward with operations that include a deep drawdown of Detroit Reservoir.

82. The SEIS acknowledges that the Detroit deep drawdown will mobilize sediment and increase turbidity downstream but does not analyze impacts based on the lessons learned from prior drawdowns, or explain how such lessons have been incorporated into operational safeguards for the Detroit deep drawdown.

83. The Corps' failure to complete the turbidity report required by WRDA deprived the agency and the public of critical information regarding foreseeable turbidity impacts and appropriate mitigation measures.

84. The absence of the required turbidity report also resulted in the Corps failing to adequately evaluate downstream water-quality risks and failing to incorporate reasonable operational protections for downstream water systems.

85. The Corps' failure to timely complete the turbidity report required by WRDA is arbitrary, capricious, and not in accordance with law in violation of the APA.

86. The Corps' failure to complete and publish the turbidity report before the conclusion of the comment period for the SEIS was arbitrary and capricious in violation of the APA.

87. The Corps' decision to proceed with the Detroit deep drawdown without first preparing the WRDA-mandated turbidity report was arbitrary, capricious, and not in accordance with law in violation of the APA.

88. The District will suffer harm from this unlawful agency action because the Detroit deep drawdown is expected to disturb sediment and increase turbidity in the North Santiam River, the primary source of water that the District conveys.

89. Without the required turbidity report and corresponding operational safeguards, the Corps' decision-making failed to adequately consider the risks posed to downstream water

infrastructure and public health.

90. The Court should order the Corps to (a) complete and publish the turbidity report, (b) withdraw the portion of the ROD related to the Detroit deep drawdown, and (c) delay any deep drawdown unless and until (i) the public has had an opportunity to comment with the benefit of the turbidity report; (ii) the Corps has considered those comments and all reasonable alternatives; and (iii) conducted the required "hard look" analysis informed by the turbidity study.

**FIFTH CLAIM FOR RELIEF**
**Violation of the APA for Action Unlawfully Withheld or Unreasonably Delayed**
**(5 U.S.C. § 706(1))**

91. Intervenor incorporates by reference the preceding paragraphs as though fully set forth herein.

92. The APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

93. WRDA requires the Corps to prepare a report addressing turbidity impacts associated with reservoir drawdowns in the WVS.

94. The purpose of the turbidity report requirement is to ensure that the Corps evaluates the water-quality impacts of drawdown operations, incorporates lessons from prior turbidity events, and implements appropriate operational safeguards to protect downstream water users and water quality.

95. Prior reservoir drawdowns in the Willamette Valley have produced substantial downstream turbidity and caused significant operational disruptions and damage to municipal drinking water systems.

96. These turbidity events demonstrate the foreseeable risks that reservoir drawdowns pose to downstream water users, including those that rely on the North Santiam River.

97. Despite this statutory mandate, the Corps has failed to prepare the turbidity report required by WRDA.

98. The Corps' failure to prepare the WRDA-mandated turbidity report constitutes agency action unlawfully withheld within the meaning of 5 U.S.C. § 706(1).

99. Alternatively, to the extent the Corps has initiated but not completed the turbidity report, the Corps has unreasonably delayed completion of that mandatory statutory duty within the meaning of 5 U.S.C. § 706(1).

100. The Corps' failure to complete the turbidity report deprives the District, downstream water users, and the public of critical information regarding the water-quality risks associated with reservoir drawdowns.

101. Without the turbidity report required by WRDA, the Corps has proceeded with drawdown planning and operations without completing the analysis that Congress mandated.

102. Unless compelled by this Court, Defendants will continue to unlawfully withhold or unreasonably delay the preparation of the turbidity report required by WRDA in violation of 5 U.S.C. § 706(1).

103. Under 5 U.S.C. § 706(1), the Corps should therefore be compelled to prepare the turbidity report required by WRDA.

104. Under 5 U.S.C. § 705, the Court should postpone the implementation of the Detroit Reservoir drawdown unless and until the Corps prepares the WRDA-mandated turbidity report.

105. The Court should order the Corps to (a) complete and publish the turbidity report, (b) withdraw the portion of the ROD related to the Detroit deep drawdown, and (c) delay any deep drawdown unless and until (i) the public has had an opportunity to comment with the

benefit of the turbidity report; (ii) the Corps has considered those comments and all reasonable alternatives; and (iii) conducted the required "hard look" analysis informed by the turbidity study.

**SIXTH CLAIM FOR RELIEF**
**Violation of the APA for Failure to Act in Accordance with the CWA**
**(5 U.S.C. § 706(2)(A))**

106. Intervenor incorporates by reference the preceding paragraphs as though fully set forth herein.

107. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

108. The CWA requires Federal Agencies, including the Corps, to comply with the water quality standards established by Oregon law. 33 U.S.C. § 1323.

109. With respect to turbidity, Oregon sets a numeric limit prohibiting increases greater than 10% above the natural upstream background turbidity caused by an activity. OAR 340-041-0036.

110. With respect to mercury, Oregon DEQ has established a TMDL pursuant to OAR 340-042-0040(1).

111. If implemented as proposed under the SEIS, the deep drawdown of Detroit Reservoir will violate the CWA with respect to turbidity criteria, and risks violating the CWA with respect to the mercury TMDL.

112. The Corps' decision to proceed with the Detroit Reservoir drawdown in violation of Oregon water quality standards and the CWA is arbitrary, capricious, and not in accordance with law and thus is unlawful and must be set aside. 5 U.S.C. § 706(2)(A).

113. The District will be harmed by this unlawful agency action to the extent that turbidity affects its fish screens, and to the extent that Oregon DEQ concludes that any resulting exceedance of the mercury TMDL requires the District to modify or cease water conveyance.

114. Under 5 U.S.C. § 705, the Court should therefore postpone the implementation of the Detroit Reservoir drawdown unless and until the Corps adequately proposes a drawdown that will comply with the CWA and the APA.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the APA for Failure to Act in Accordance with 33 C.F.R. Part 234**
**(5 U.S.C. § 706(2)(A))**

115. Intervenor incorporates by reference the preceding paragraphs as though fully set forth herein.

116. The APA requires that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

117. The WVS, Detroit Dam, and Detroit Reservoir are water resource investments per WRDA and 33 C.F.R. Part 234.

118. The regulations in 33 C.F.R. Part 234 apply to "studies to support significant changes to project operations including any such changes that warrant preparation of an environmental impact statement." 33 C.F.R. § 234.4(d)(1).

119. The regulations in 33 C.F.R. Part 234 apply to the Corps' evaluation of the planned deep drawdown of Detroit Reservoir.

120. 33 C.F.R. Part 234 requires that "the final array of alternatives, shall include, at a minimum . . . An alternative that is locally preferred. If this alternative differs from the net public benefits alternative, it will be required to have a comparable level of detail and analyzed using

the same analytical framework as the net public benefits alternative." 33 C.F.R. § 234.8(a)(6).

121. 33 C.F.R. Part 234 requires that "If one or more of the required alternatives is not included because the Corps was not able to identify a potential solution that is feasible and consistent with the purpose of the study, the study must document that decision." 33 C.F.R. § 234.8(f).

122. Neither the SEIS nor the ROD identifies any of the considered alternatives as "locally preferred."

123. Neither the SEIS nor ROD documents a decision not to consider a "locally preferred" alternative.

124. The SEIS does not comply with 33 C.F.R. § 234.8.

125. 33 C.F.R. Part 234 requires that "Analysis to support the evaluation of alternatives shall use the best available actionable science." 33 C.F.R. § 234.7(c)(1).

126. The SEIS relied on the September 2015 Literature Synthesis for its observed trends in climate literature. The SEIS acknowledges that "substantial research has occurred" since publication of the Synthesis, and "[t]he number of relevant literature studies reviewed would likely increase for all hydrologic variables should this figure be updated." App. F1 p. 16.

127. Relying on climate literature from over a decade ago is not "the best available science."

128. 33 C.F.R. Part 234 requires that the "level of detail required to support alternatives analysis may vary but should be sufficient to inform the decision-making process efficiently and effectively. The level of detail, scope, and complexity of analyses should be commensurate with the scale, impacts, costs, scientific complexities, uncertainties, risk, and other aspects (such as public concern) inherent in potential decisions." 33 C.F.R. § 234.7(c)(2).

129. The SEIS does not include sufficient level of detail, especially considering the significant public concern.

130. The SEIS does not comply with 33 C.F.R. § 234.7(c)(2).

131. 33 C.F.R. Part 234 requires that "the Corps shall identify, describe, and quantify (if feasible) areas of risk and uncertainty and consider them in decision-making. Risks and uncertainties shall be identified and described in a manner that is clear and understandable to the public and decision-makers. This includes describing the nature, likelihood, and magnitude of risks, as well as the uncertainties associated with key supporting data, projections, and evaluations of competing alternatives." 33 C.F.R. § 234.7(d).

132. The SEIS does not include sufficient level of identification, description, and quantification of risk.

133. The SEIS does not comply with 33 C.F.R. § 234.7(d).

134. 33 C.F.R. Part 234 requires that "analysis shall consider water availability, water uses, and resilience over a range of conditions, from too little water in drought and multiple-use scenarios, to too much water in flood scenarios." 33 C.F.R. § 234.7(g).

135. The SEIS does not include sufficient level of consideration of water availability in drought or multiple use scenarios after a deep drawdown at Detroit Reservoir.

136. The SEIS does not comply with 33 C.F.R. § 234.7(g).

137. The Court should order the Corps to (1) withdraw the portions of the ROD and SEIS related to the Detroit deep drawdown; and (2) not begin any deep drawdown at Detroit Reservoir until the Corps has completed a new SEIS process that complies with 33 C.F.R. Part 234 and the APA.

## IV. PRAYER FOR RELIEF

WHEREFORE, Intervenor respectfully requests entry of judgment against Defendants and that the following relief be granted:

1. Setting aside the portions of the SEIS and related agency findings that authorize or rely upon the proposed deep drawdown of the Detroit Reservoir;

2. Compelling Defendants to complete the turbidity report required by the WRDA;

3. Compelling Defendants to withdraw either the entire ROD or the portion of the ROD related to the Detroit Reservoir deep drawdown;

4. Prohibiting Defendants from beginning any deep drawdown at Detroit Reservoir unless and until they have completed a new SEIS process that complies with NEPA, CWA, WRDA, 33 C.F.R Part 234, and the APA;

5. Awarding attorney fees and costs to the extent allowed by law; and

6. Such further relief as the Court deems just and proper.

DATED: August 19, 2026

STOEL RIVES LLP

*s/ Samantha K. Sondag*

DAVID FILIPPI, OSB No. 965095
david.filippi@stoel.com
SAMANTHA K. SONDAG, OSB No. 154244
samantha.sondag@stoel.com

*Attorneys for Intervenor-Plaintiff Santiam Water Control District*